# Brief In Support

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| DENNIS BLACK, *et al.*, | ) | |
| | ) | Case No. 2:09-cv-12810 |
| Plaintiffs, | ) | Hon. Sean F Cox |
| | ) | Magistrate Judge Michael Hluchaniuk |
| v. | ) | |
| | ) | |
| CRAIG G. NAYLOR, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Howard S. Sher (P38337)
Alan J. Schwartz (P38144)
JACOB & WEINGARTEN, P.C.
777 Somerset Place
2301 Big Beaver Road
Troy, Michigan 48084
Telephone: 248-649-1900
Facsimile: 248-649-2920
E-mail:  alan@jacobweingarten.com

-and-

Anthony F. Shelley
Timothy P. O'Toole
MILLER & CHEVALIER CHARTERED
655 15th Street, N.W.
Suite 900
Washington, D.C. 20005
Telephone: 202-626-5800
Facsimile: 202-626-5801
E-mail:  ashelley@milchev.com
          totoole@milchev.com

*Attorneys for Plaintiffs*

## STATEMENT OF ISSUE PRESENTED

Should the Court enter a temporary restraining order or preliminary injunction to maintain the status quo and therefore prohibit fiduciaries of a pension plan governed by the Employee Retirement Income Security Act from negotiating, entering into, or further effectuating any agreement with the Pension Benefit Guaranty Corporation summarily to terminate the pension plan, until such time as the Court can resolve the Complaint seeking the removal of fiduciaries who Plaintiffs contend labor under a severe conflict of interest?

## STATEMENT OF CONTROLLING AUTHORITY

I.      In considering whether to grant preliminary relief, the court must consider whether: (1) the movant has a strong likelihood of success on the merits; (2) the movant would suffer irreparable injury without the injunction; (3) the issuance of the injunction would cause substantial harm to others; and (4) the public interest would be served by issuance of the injunction. *In re De Lorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985).

II.     "The duties charged to an ERISA fiduciary are 'the highest known to the law.'" *Gregg v. Transportation Workers of America International*, 343 F.3d 833, 841 (6th Cir. 2003) (quoting *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002)).

III.    ERISA requires that a fiduciary "'act for the exclusive purpose' of providing benefits to plan beneficiaries." *Gregg*, 343 F.3d at 840 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)).

IV.     ERISA requires fiduciaries "to avoid placing themselves in a position where their acts as directors or officers of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees." *McMahon v. McDowell*, 794 F.2d 100, 110 (3d Cir. 1986). "This duty may, in some circumstances, require the fiduciary to step aside in favor of a neutral referee, or at the least, to conduct an explicit inquiry into the potential for a conflict of interest." *McMahon*, 794 F.2d at 110 (citing *Donovan*, 680 F.2d at 271).

**INDEX OF EXHIBITS**

A.   Declaration of Charles Cunningham

B.   Delphi September 12, 2008 Press Release

C.   Excerpts from Delphi's June 1, 2009 Supplement to Motion for Order Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures

D.   Delphi June 1, 2009 Press Release

E.   Statement of Pension Benefit Guaranty Corporation in Response to First Amended Joint Plan of Delphi Corporation and Certain Affiliates, Debtors and Debtor-Possession

F.   Opinion in *Bromley v. Bromley*, Case No. 05-71798, 2006 U.S. Dist. LEXIS 72398 ( E.D. Mich. Oct. 4, 2006)

Pursuant to Local Rule 7.1(c)(1), Plaintiffs respectfully submit this memorandum of points and authorities in support of their motion for a temporary restraining order and preliminary injunction.

## **INTRODUCTION**

Plaintiffs are retirees or retirement-eligible individuals seeking to protect their pension plan, which is sponsored by Delphi Corporation ("Delphi"). They believe that the current fiduciaries of the pension plan -- who are Delphi executives -- are negotiating an agreement with the Pension Benefit Guaranty Corporation (a federal government entity insuring pensions) summarily to terminate the plan. Such a summary termination can, by law, happen only when the plan's fiduciaries, *acting solely in the interests of plan participants*, agree to a summary termination; otherwise, a district court proceeding adjudicating the merits of any termination must occur, with full notice to participants and opportunity for them to challenge the termination.

But here, the fiduciaries who have or may be about to forfeit the participants' rights to notice and hearing labor under a severe conflict of interest: on the one hand, as corporate executives, they seek a rapid termination of the pension plan, most notably because they are being pressured by the federal government as part of the purchase by General Motors Company ("the New GM") of a substantial portion of the assets of General Motors Corporation ("GM") -- Delphi's former parent -- to have Delphi effectuate its Modified Reorganization Plan; on the other hand, as fiduciaries of the pension plan, the Delphi executives' interest is in favor of careful consideration of plan termination, a judicial adjudication of termination (as is the norm), and even rejection altogether of termination. Due to this conflict, the Complaint in this case

seeks the removal of the Delphi executives as fiduciaries for purposes of any termination

negotiations or proceedings.

The current motion seeks simply to maintain the status quo pending determination of the

Complaint.  To wit, because all of the necessary requirements for preliminary relief maintaining

the status quo are present, the Court should enter an order temporarily restraining or

preliminarily enjoining the current fiduciaries, until the Complaint is resolved, from negotiating,

signing, or further effectuating any agreement summarily to terminate the Plan.  Plaintiffs

request that the Court enter such an order prior to 10 a.m. on Thursday, July 23, 2009, because,

at that time, a bankruptcy court will convene a hearing with respect to Delphi's Modified

Reorganization Plan and Delphi appears to be pressing to resolve all of its remaining issues,

including issues with respect to the termination of the Plan, before or at that hearing.

## BACKGROUND

**A.    Statement of Facts**

Plaintiffs' Complaint is brought under the Employee Retirement Income Security Act

("ERISA" or "the Act"), 29 U.S.C. §§ 1001, *et seq.*[1]  Plaintiffs (sometimes here referred to as

"the Salaried Retirees") are participants in the Delphi Retirement Program for Salaried

Employees ("the Plan").  *See* Ex. A ¶ 4.  Delphi is the Plan's sponsor.  *Id.* ¶¶ 3-4.  As recited in

the Complaint, Delphi was an operating unit of GM, the original sponsor of the Plan.  Delphi was

incorporated separately in 1998 and was spun-off from GM in 1999.  When Delphi was spun off

---

[1] The facts referenced in this motion are either taken from the Plan itself (attached as an Exhibit to the Complaint) and the declaration of Charles Cunningham (attached as Exhibit A to this motion).  Or they are subject to judicial notice under Fed. R. Evid. 201(b) because they are matters of common knowledge or are subject to ready verification from sources whose accuracy cannot reasonably be questioned.

in 1999, it assumed responsibility for maintaining the pension plans for all Delphi employees. Those plans included the Salaried Retiree Plan, as well as a separate plan for hourly retirees ("the Hourly Plan"), which had been negotiated by their representative, the United Auto Workers union. *Id.* ¶ 3. There are currently over 15,000 participants in the Salaried Pension Plan; most spent the bulk of their careers working for GM, but became part of the Delphi plan at the time of the spin-off in 1999.

Defendants are the individual members of Delphi's Executive Committee. Under the terms of the Plan, they are the "named fiduciary" of the Plan, with the concomitant responsibility to administer the Plan. *Id.* ¶¶ 6, 14. (We refer to Defendants here sometimes as "the Plan Administrator.") In October 2005, Delphi filed for Chapter 11 bankruptcy in the United States District Court for the Southern District of New York. *See In re Delphi Corp., et al.*, Case No. 05-44481 (RDD) (S.D.N.Y.; filed Oct. 8, 2005). Because the Plan is a potential creditor with claims against Delphi, and because Defendants, as fiduciaries of the Plan, have a duty to act in the sole interests of the Plan beneficiaries and participants, Delphi's financial distress placed Defendants in a conflicted situation. On the one hand, their responsibilities to Delphi and its shareholders required Defendants to take any necessary measures to protect Delphi's finances; on the other hand, Defendants' fiduciary obligations to Plaintiffs required them to take steps to protect the participants' interests in the Plan, even if doing so would further weaken Delphi's already tenuous financial situation.

In January 2006, in recognition of the obvious conflict of interest inherent in retaining fiduciary powers along with their corporate offices, Delphi delegated certain limited fiduciary responsibilities to Fiduciary Counselors, Inc. ("Fiduciary Counselors"). Ex. A ¶ 10.

Specifically, Delphi delegated to Fiduciary Counselors the limited responsibility to act on behalf of the Plan *solely* with respect to pursuing so called "funding claims" -- that is, to make claims against Delphi where it fails to make a legally required contribution to the Plan. *Id.* The delegation of authority to Fiduciary Counselors did not include matters related to the termination of the Plan, likely because Delphi had made clear throughout the bankruptcy proceedings that it intended to preserve the Plan. *Id.* Indeed, from the time of its bankruptcy, Delphi had steadfastly stated that its pension plans would survive the bankruptcy. *Id.* at ¶ 9.

In September 2008, Delphi announced that it had concluded a deal with GM and the PBGC in which Delphi could potentially transfer up to $3.4 billion in net pension liabilities from its Hourly Plan to an existing GM plan, meaning that the Hourly Plan would continue (rather than be terminated). *See* Ex. B. The first part of the transfer was completed on September 29, 2008, when GM assumed $2.1 billion of pension liability for the hourly workers from Delphi, with the remaining amount contingent on Delphi's emergence from bankruptcy. *See* Delphi's Supplement to Motion for Order Approving Modifications to Debtors' First Amended Plan of Reorganization, Ex. C (excerpts), pages 10, S-xx. Although it did not appear at the time of the September 2008 deal that the Plan fiduciaries had attempted to secure a similar deal to protect the Salaried Workers, there was, again, according to Delphi, no reason for them to be alarmed. Delphi reiterated its commitment to protect all of its pension plans in a September 12, 2008 press release announcing that Delphi "remained committed to fully funding our pension plans." *See* Ex. B.

This situation, however, has changed dramatically over the past six weeks. On June 1, 2009, Delphi announced, in conjunction with a bankruptcy filing, that it had developed "a

workable pension solution for its defined benefit plans." *See* Ex. D. The bankruptcy filing states

now that the Plan shall be terminated. More specifically, according to the bankruptcy filing,

Delphi expects to enter into an agreement with the PBGC, whereby the PBGC will initiate

involuntary termination proceedings, taking over responsibility for the Plan. *See* Ex. C at 10, S-

ix, S-xv, S-xx. If this stated intention comes to fruition, it will mean that Delphi protected the

Hourly Plan, but abandoned the Plan for Salaried Retirees to the federal government. The PBGC

recently confirmed that, as of July 15, 2009, no agreement with respect to the Plan yet has been

reached. *See* Ex. E.

   The financial consequences of termination of the Plan to the Salaried Retirees will likely

be severe. The Salaried Retirees have undertaken an analysis of the impact to its members

should the PBGC assume responsibility for the Plan, and that analysis concluded that the

members stand to lose between 30% to 70% of their current pension benefits. *See* Ex. A ¶ 12.

Such a loss stems, in part, from various statutory limits placed on distribution of a terminated

plan's remaining assets and the manner in which the PBGC interprets its obligation to guarantee

benefits for a terminated plan. *See, e.g.*, 29 U.S.C. § 1344(a) (containing various limitations on

distribution of remaining Plan assets); *id.* § 1322(b) (PBGC maximum guarantee).

   At the same time, the ability of the Association's members fully to evaluate the effects of

any proposed termination is severely hampered by the failure of Defendants to disclose the

details of their negotiations regarding the Plan's termination or the material considerations

driving it. *See* Ex. A ¶¶ 8, 13. From the time of the bankruptcy filing, Plaintiffs have not

received any communications (whether by mail, e-mail, phone, or any other form) directly from

the Plan Administrator (including Messrs. Naylor, Farr, and Welch, in their role as fiduciaries of

the Plan) regarding developments related to the Plan. *Id.* ¶ 8. The Salaried Retirees, instead, have been forced to learn about matters related to Plan termination only through the media or other means. In that vein, a Delphi executive informally reported to one Plaintiff that Delphi's change in position toward the Plan (from continuation to termination) was driven in large part by pressure from Treasury Department, as was the decision to protect the plan of Delphi's unionized hourly workers. *Id.* ¶ 14.

Finally, one critical upcoming date is July 23, 2009. On that day, the bankruptcy court has scheduled proceedings concerning objections to the Modified Reorganization Plan. Delphi appears to be pressing to resolve all of its remaining issues in the hopes of confirming its Modified Reorganization Plan.

### B.    Regulatory Background

The regulatory regime governing ERISA plan termination is fully set forth in the Complaint. *See* Compl. ¶¶ 24-37. For purposes of this motion, only a few points need be emphasized. As a legal matter, Plan termination involves a complicated procedural process, the outcome of which is entirely speculative in any given case. Under ERISA, a bevy of substantive and procedural requirements must first be satisfied before a plan is terminated; as a result, the terms of any such termination cannot simply be decreed by the employer, plan administrator, or even the PBGC. For example, the involuntary termination contemplated by Delphi's bankruptcy under what has been entitled, in the bankruptcy court, the "Modified Reorganization Plan" must be perfected under 29 U.S.C. § 1342, which requires a hearing in a federal district court, contains procedural safeguards for participants, and can be accomplished only if the best interests of the pension plan participants so require. This procedure can be bypassed, *see* 29 U.S.C § 1342(c),

but only in the event a plan's administrator -- *i.e.*, the fiduciary of the participants -- agrees with the PBGC to a summary termination. *See In re Jones & Laughlin Hourly Pension Plan v. LTV Corp.*, 824 F.2d 197, 199 (2d Cir. 1987). The potential availability of this summary procedure is a focus of Plaintiff's Complaint, for they contend that the current Plan Administrator, namely, the individual Defendants here, is in no position lawfully to make a decision concerning a *summary* Plan termination (or, for that matter, any aspect of termination), because of their competing loyalties.

## ARGUMENT

### *THE COURT SHOULD ENTER A TEMPORARY RESTRANING ORDER OR PRELIMINARY INJUNCTION PROHIBITING DEFENDANTS, UNTIL THE COMPLAINT CAN BE RESOLVED, FROM NEGOTIATING, ENTERING, OR EFFECTUATING AN AGREEMENT WITH THE PBGC AUTHORIZING SUMMARY TERMINATION OF THE PLAN*

Fed. R. Civ. P. 65 permits this Court to enter a temporary restraining order or preliminary injunction whenever the balance of equities favors the moving party. In considering whether to grant preliminary relief, the Sixth Circuit has directed consideration of the following factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *See In re De Lorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985). These are "factors to be balanced, not prerequisites that must be met." *Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). "These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030 (6th Cir. 1995). In this case,

all four factors favor the Salaried Retirees and warrant an order maintaining the status quo -- *i.e*,
prohibiting the negotiation, signing, or effectuation of an agreement summarily to terminate the
Plan -- pending final adjudication of the Complaint.

## I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

At this preliminary stage of the proceedings, Plaintiffs can make a strong showing as to
likelihood of success on their Complaint.  The Defendants have an obvious conflict of interest
concerning termination between their loyalties to Delphi as corporate officers and their statutory
obligations under ERISA to the Salaried Retirees as fiduciaries.  This conflict prohibits them
from negotiating with the PBGC over the terms and conditions under which any Plan termination
would take place and disqualifies them from effecting a deal summarily to terminate the Plan
under 29 U.S.C. § 1342.

The law is clear as to what the likelihood of success factor entails.  The Sixth Circuit has
held that, "[in] order to establish a likelihood of success on the merits of a claim, a plaintiff must
show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Sys.*,
119 F.3d 393, 402 (6th Cir. 1997) (internal citation omitted).  "However, it is ordinarily
sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult,
and doubtful as to make them a fair ground for litigation and thus for more deliberate
investigation." *Id.*

That standard is met here.  Indeed, the operative facts in support of this motion are
simple, narrow, and unlikely to be disputed.  The legal consequences of those simple facts,
moreover, are plain:  Defendants, in their capacity as Delphi officers, owe obligations to Delphi
under the Modified Reorganization Plan, obligations heightened by apparent pressure from the

current U.S. Administration to ensure that the New GM (of which more than a majority is owned by the United States) has immediate access to one of its primary parts suppliers. Given the pressure being exerted upon Delphi, the current Plan fiduciaries cannot perform their competing obligations under ERISA to act in the undivided interests of participants during negotiations related to Plan termination. The continued participation of Defendants in these negotiations violates their fiduciary duty to the Plan's participants under ERISA § 404(a)(1), 29 U.S.C. § 1104(a). Thus, the Salaried Retirees are likely to prevail ultimately in obtaining the limited form of relief they are seeking in their Complaint for equitable relief: The appointment of an independent fiduciary as Plan Administrator, pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109, who can conduct any negotiations related to Plan termination by acting only in the participants' best interests.

### A.     Defendants Owe a Paramount Duty of Loyalty to the Salaried Retirees, Including Acting Free from Conflicts of Interest

The primary component of Plaintiffs' legal claim is that Defendants, as Plan fiduciaries, owe a paramount duty of loyalty to the Salaried Retirees, including with respect to the manner in which any termination of the Plan may occur under 29 U.S.C. § 1342. "The duties charged to an ERISA fiduciary are 'the highest known to the law.'" *Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 841 (6th Cir. 2003) (quoting *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002)). Among these duties are those enumerated in ERISA § 404, 29 U.S.C. § 1104, pursuant to which there is a "duty of loyalty" requiring that "'all decisions regarding an ERISA plan must be made with an eye single to the interests of the participants and beneficiaries.'" *Id.* at 840 (quoting *Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995)). Additionally, under § 404, fiduciaries are charged with the "prudent man" standard, under which they have an

"'unwavering duty' to act both 'as a prudent person would act in a similar situation' and 'with single-minded devotion' to those same plan participants and beneficiaries." *Id.* (quoting *Berlin v. Mich. Bell Tel. Co.*, 858 F.2d 1154, 1162 (6th Cir. 1988)). ERISA further requires that a fiduciary "'act for the exclusive purpose' of providing benefits to plan beneficiaries." *Gregg*, 343 F.3d at 840 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)). Overall, ERISA sets forth a "rigorous standard" for fiduciary loyalty, taken from the "common-law conception of a trustee." *McMahon v. McDowell*, 794 F.2d 100, 110 (3d Cir. 1986).

Encompassed within the duty of loyalty is a fiduciary's obligation to make decisions free from any conflicts of interest. Courts have consistently recognized that fiduciaries have an obligation under ERISA "'to avoid placing themselves in a position where their acts as directors or officers of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees." *Id.* at 110; *accord Difelice v. U.S. Airways, Inc.*, 497 F.3d 410, 417 (4th Cir. 2007) ("Under ERISA, plan fiduciaries are assigned a number of detailed duties and responsibilities, which include the proper management, administration and investment of plan assets, the maintenance of proper records, the disclosure of specific information, and the avoidance of conflicts of interest."). In turn, where a fiduciary fails to step aside despite a beneficiary having reason to doubt the zeal of the fiduciary's representation, a court should remove him so that the trust may be properly executed. The Supreme Court has stated:

> The power of a court of equity to remove a trustee, and to substitute another in his place, is incidental to its paramount duty to see that trusts are properly executed, and may properly be exercised whenever such a state of mutual ill feeling, growing out of his behavior, exists between the trustee, or between the trustee in question and the beneficiaries, that his continuance in office would be detrimental to the execution of the trust, even if for no other reason than that human infirmity would prevent the co-trustee or the beneficiaries from working in harmony with

him, and although charges of misconduct against him are either not made out, or are greatly exaggerated.

*May v. May*, 167 U.S. 310, 320-321 (1897); *accord McMahon*, 794 F.2d at 110.

It is unlikely that the Defendants will dispute the contours of their fiduciary obligations to the Salaried Retirees or even a fiduciary's obligation to remove himself where he labors under a conflict of interest. They may attempt to challenge, however, whether they are acting in a fiduciary capacity when engaging in negotiations with the PBGC about the manner in which, and even if, the Plan should be terminated. Such a challenge will not withstand scrutiny.

To be sure, there is nothing inherently wrong with assigning to Delphi executives the additional role of Plan Administrator: "Company management often wears two hats in the administration of company benefit plans." *Drennan v. General Motors Corp.*, 977 F.2d 246, 251 (6th Cir. 1992). Where a fiduciary wears "two hats" as an employer and an administrator, he assumes fiduciary status only when and to the extent that he functions in his capacity as plan administrator, and not when he conducts business that is not regulated by ERISA. *Berlin v. Michigan Bell Tel. Co.*, 858 F.2d 1154, 1163 (6th Cir. 1988). The pertinent question, therefore, is whether the negotiations between the PBGC and the Plan Administrator over the circumstances and method of any Plan termination are fiduciary in nature.

The answer is that they are. Normally, an employer's decision to terminate a pension plan is what is known as a sponsor's "settlor" function, as opposed to a fiduciary function. *Beck v. PACE Int'l Union*, 551 U.S. 96, 101 (2007). But here, no employer would be making a decision to terminate the Plan; instead, Delphi has announced that the Plan would be *involuntarily* terminated through a takeover by the PBGC pursuant to ERISA § 4042, 29 U.S.C. § 1342. In fact, § 1342 makes no mention at all of plan sponsors or employers; it references only

11

decisions to be made by (other than the PBGC or a district court) a plan administrator, who is plainly a fiduciary. *See* 29 U.S.C. § 1002(21)(A)(i). Accordingly, the typical immunity for the actual decision to terminate a plan *made by an employer* is inapplicable.

Moreover, even where the decision to terminate is deemed a settlor function, it is well-established that *the method of termination* is a fiduciary function. *E.g.*, *Larson v. Northrop Corp.*, 21 F.3d 1164, 1169 (D.C. Cir. 1994) ("Although the decision to terminate a pension plan is generally not subject to the fiduciary responsibility provision of ERISA, the Department of Labor has emphasized that activities undertaken to implement the termination decision are generally fiduciary in nature.") (internal quotation marks omitted); *Waller v. Blue Cross*, 32 F.3d 1337, 1342 (9th Cir. 1994) ("Plaintiffs do not dispute that the decision to terminate a plan is a business decision and does not constitute a breach of fiduciary obligation. . . . By alleging that Blue Cross breached its fiduciary duty in the selection of annuity providers, plaintiffs attack not the decision to terminate, but rather the implementation of the decision. We believe that this distinction is dispositive and hold that Blue Cross acted in a fiduciary capacity when choosing annuity providers to satisfy plan liabilities.") (internal citations and quotation marks omitted).

In sum, because the termination contemplated here is an involuntary termination under ERISA § 4042, 29 U.S.C. § 1342, and because the method of termination also is at issue, Defendants' role is that of a fiduciary. Defendants are obligated to perform their duties respecting any termination "with single-minded devotion" to the Plan's participants and beneficiaries in accordance with the high standards enunciated in ERISA § 404, 29 U.S.C. § 1104. *Gregg*, 343 F.3d at 840.

> **B.      The Salaried Retirees Are Likely to Prevail on Their Claim that Defendants Breached Their Fiduciary Obligation to Act Free of Conflicts of Interest**

12

The Salaried Retirees are likely to prevail on their claim that the Defendants have breached their fiduciary obligation to act free from conflicts of interest; and because Defendants have not removed themselves despite being under a conflict of interest, Plaintiffs are likely to succeed in removing Defendants as Plan fiduciaries.  Defendants have an irreconcilable conflict of interest in connection with their termination negotiations with the PBGC.  Their role as executives of Delphi leads them to weigh heavily in favor of an agreement to permit summary termination under § 1342(c), since doing so will permit Delphi immediately to shed, without complication, its Plan liabilities and effectuate its Modified Reorganization Plan.  That interest is overwhelming in this case because the federal government is pressing Delphi to rapidly resolve its bankruptcy issues in order to create a workable parts supplier for the New GM, in whose success -- indeed, immediate success -- the Executive Branch as current and unprecedented majority owner has a strong political interest.

On the other hand, as fiduciaries of the Plan, Defendants would be required to ignore their irresistible corporate inclination in favor of rapid and unchallenged termination of the Plan and instead seek either no termination at all or at least a careful termination that maximizes the participants' benefits.  In the particular circumstances of this case, the fiduciaries' obligations to the participants with respect to termination could only be discharged in favor of termination (summary or otherwise) *after* exhausting efforts to fund the Plan through contribution from the New GM, just as these same fiduciaries sought and obtained funding with respect to the Hourly Plan.  Or the Plan Administrator could agree to Plan termination procedures only *after* having exhausted efforts to increase Plan funding (therefore limiting benefits losses in a PBGC takeover) through liens on Delphi assets not subject to bankruptcy.  *In the Matter of UAL*

*Corporation*, 468 F.3d 444, 451 (7th Cir. 2006) ("An employer that terminates an underfunded plan becomes liable to the PBGC for the amount of the shortfall. 29 U.S.C. Section 1362. United was in economic distress and could not satisfy that obligation in liquid assets; the PBGC agreed to accept about $1.5 billion of stock in the post-reorganization United."). Plaintiffs are aware that there are international assets relating to Delphi that are not part of the bankruptcy estate on which the PBGC previously has made claim (*see* Ex. C, page S-22), and a Plan Administrator acting solely in the best interests of the participants could not agree to termination without pursuing such additional funding sources. Finally, a Plan Administrator could agree to summary Plan termination only when the usual route of termination -- which is the route that protects Plan participants both via a district court proceeding to review the termination and through notice to them and ability to challenge the termination -- is, for exigent circumstances, unworkable. All of these obligations to Plan participants with respect to whether to terminate and the method of termination are inconsistent with a U.S. government-forced, rapid termination of the Plan that Defendants' corporate interests seemingly compel.

In light of the overt conflict of interest regarding termination, Defendants had and have an obligation to step aside and appoint an independent, unconflicted fiduciary to serve as Plan Administrator to protect the interests of the Plan's participants and beneficiaries, just as they had already done when they realized that their conflict of interest required appointment of Fiduciary Counselors to serve as an independent fiduciary for some purposes. By failing to step aside when they have conflicting interests, Defendants have breached their duties under ERISA and their removal is clearly warranted.

This fiduciary breach alone is enough to demonstrate Plaintiffs' high likelihood of success, but Plaintiffs' case gains even further strength in light of Defendants' utter failure to inform the Plan's participants of material developments related to Delphi's negotiations with the PBGC. *See, e.g., Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 548 (6th Cir. 1999) ("the 'duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.'") (quoting *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993)); *Shea v. Esensten*, 107 F.3d 625, 628 (8th Cir. 1997) ("the duty of loyalty requires an ERISA fiduciary to communicate any material facts which could adversely affect a plan member's interests"). In reality, the two breaches are likely related, as Defendants' conflict of interest probably has caused them not to make disclosures in order to avoiding upsetting the corporate interest in a rapid, unchallenged termination. While the suppression of material information is predictable here, it is also unlawful under ERISA's fiduciary standards.

Last, Defendants' actions with respect to the Hourly Workers Plan underscore their likely breach of fiduciary duties in proceeding forward in any respect with termination of the Salaried Retirees' Plan. Plaintiffs believe that Defendants are fiduciaries for both Plans, but only the Hourly Plan so far has been protected. It is no coincidence that the Hourly Plan covers UAW union members, who are, frankly, politically protected by the current Executive Branch that is the majority owner of the New GM and pressing for the rapid wind-down of Delphi's bankruptcy. That the Hourly Plan and the Salaried Retirees' Plan have fared oppositely -- despite the New GM having equal moral and legal obligation to the participants in both plans and

15

the fiduciaries in both plans being the same and having the same obligations to save the plans --
is testament that Delphi executives have acted pursuant to political and corporate interests rather
the participant interests.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IN THE ABSENCE OF THE REQUESTED PRELIMINARY RELIEF

The Salaried Retirees also can make a strong showing on the irreparable harm factor.
Preliminary injunctive relief is proper to protect a movant from imminent harm when another
party threatens suddenly to alter the *status quo* in a manner that would deprive the movant of its
rights. Indeed, "[t]he purpose of a preliminary injunction is always to prevent irreparable injury
so as to preserve the court's ability to render a meaningful decision on the merits." *United Food
& Commer. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th
Cir. 1998). Moreover, "if it is found that a constitutional right is being threatened or impaired, a
finding of irreparable injury is *mandated.*" *ACLU v. McCreary County, Kentucky*, 354 F.3d 438,
445 (6th Cir. 2003) (*citing Elrod v. Burns*, 427 U.S. 347, 373 (1976) (emphasis added)).

The sole relief Plaintiffs are seeking in this motion is an order preventing Defendants
from further negotiating, entering into, or effectuating any agreement with the PBGC for
summary termination of the Plan, pending the outcome of the litigation. The consequences of
such an agreement upon Plaintiffs' procedural rights cannot be overstated. As noted above,
ERISA § 4042, 29 U.S.C. § 1342, provides Plaintiffs with procedural protections in any action
involuntarily to terminate a plan; however, the statute also permits the Plan Administrator to
agree to summary termination if doing so is in the best interests of the participants. Under
normal circumstances, this is not a problem because the Plan Administrator will only agree to
summary termination when doing so protects the participants. Here, however, there is significant

reason to believe that the conflicted Plan Administrator may agree *within the next few days* to summary termination in order to facilitate Delphi's Modified Reorganization Plan, even though doing so is not in Plaintiffs' best interests.

If a conflicted Plan Administrator were to reach such an agreement, it would effectively forfeit illegitimately the procedural protections provided to participants in a § 1342 proceeding, for a summary termination occurs without notice to them or any opportunity for challenge. *See In re Jones & Laughlin Hourly Pension Plan*, 824 F.2d 197, 200-01 (2d Cir. 1987) (with summary procedures, "Congress contemplated that termination could occur without a court adjudication"; summary termination is "without prior notice and hearings"). The participants will have suffered the grave financial losses associated with a PBGC takeover of the Plan, without any procedural safeguard -- such as either through the decision of an unconflicted Plan Administrator having determined that summary termination is in their best interest or a district court having, upon challenge, adjudicated the propriety of termination. Courts have found similar imminent, illegal losses of procedural rights to satisfy the irreparable-harm requirement. *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("[A] plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."); *Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp. 2d 962, 969 (W.D. Mich. 2008) ("the loss of constitutional freedoms, the loss of privacy, damage to one's personal reputation, and the loss of a business's goodwill or fair competition have all been held to constitute irreparable harm that can warrant issuance of preliminary injunctive relief on an appropriate set of facts."). In fact, in *Bromley v. Bromley*, Case No. 05-71798, 2006 U.S. Dist. LEXIS 72398 ( E.D. Mich. Oct. 4, 2006), the district court

granted a preliminary injunction based on similar allegations of irreparable harm, concluding that

the defendants there were committing continuing fiduciary breaches in their capacity as directors

by making self-dealing bylaw amendments and enjoining them from taking a number of actions

that might result in future fiduciary breaches while the lawsuit remained pending.   (A copy of

the *Bromley* decision is attached as Ex. F).

## III.   PRELIMINARY RELIEF WILL NOT CAUSE SUBSTANTIAL HARM TO OTHERS' INTERESTS

With respect to this requirement, the requested relief will not substantially harm any

interests of any other parties.  The relief is narrowly tailored, and seeks only to enjoin

Defendants from negotiating, entering, or effectuating an agreement to summarily terminate the

Plan pending the appointment of an unconflicted fiduciary.

Additionally, the requested relief in no way injures any legitimate interest of any

Defendant or any outside parties.  Defendants have no cognizable interest in remaining as

fiduciaries when it is contrary to the participants' interests, since their sole obligation always is

to the participants.  In addition, if the circumstances here truly are fit for a rightful summary

termination, the requested relief does not foreclose the possibility that such a summary

termination might take place.  It only enjoins *Defendants,* who are irreconcilably conflicted, from

effecting such a termination, pending adjudication of their ability to serve as fiduciaries for the

Plan.  As such, Defendants could step aside and appoint an unconflicted fiduciary to assume the

responsibility of Plan Administrator, removing any obstacle that this narrowly tailored injunctive

relief poses to summary termination.

## IV.   THE PUBLIC INTEREST FAVORS THE REQUESTED RELIEF

Issuing preliminary relief also serves the public interest because ERISA "protect[s] the interests of participants in employee benefit plans by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, . . . [and] by providing for appropriate remedies, sanctions, and ready access to the Federal Court." *Bailey v. AK Steel Corp.*, No. 1:06cv-468, 2006 U.S. Dist. LEXIS 68298, at *36 (S.D. Ohio Sept. 22, 2006) (internal citation omitted). No interest of the public is served in the termination of a pension plan in a nefarious manner, and the public interest surely is furthered simply by maintaining the status quo while the Court can investigate and determine whether a pension plan might be terminated in a nefarious manner. "The 'public interest lies in protecting the legitimate expectations of retirees that their [protected benefit] will be provided for the rest of their lives.'" *Id.* at *37 (quoting *Helwig v. Kelsey-Hayes Co.*, 857 F. Supp. 1168, 1181 (E.D. Mich. 1994)).

## CONCLUSION

The Court should enter a temporary restraining order and preliminary injunction prohibiting the Plan Administrator from negotiating, signing, or effectuating an agreement with the PBGC summarily to terminate the Plan, pending determination of the Complaint.

Respectfully submitted,

Dated: July 21, 2009                 JACOB & WEINGARTEN, P.C.

/s/ Howard S. Sher
Howard S. Sher (P38337)
Alan J. Schwartz (P38144)
777 Somerset Place
2301 Big Beaver Road
Troy, Michigan 48084
Telephone: 248-649-1900
Facsimile: 248-649-2920
E-mail: alan@jacobweingarten.com

-and-

Anthony F. Shelley
Timothy P. O'Toole
MILLER & CHEVALIER CHARTERED
655 15th Street, NW
Suite 900
Washington, DC 20005
Telephone: 202-626-5800
Facsimile: 202-626-5801
E-mail: ashelley@milchev.com

***Attorneys for Plaintiffs***