UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENNIS BLACK, et al.,

        Plaintiffs,

v.

CRAIG G. NAYLOR, et al.,

        Defendants.

Case No. 2:09-cv-12810
Hon. Sean F. Cox
Magistrate Judge Michael Hluchaniuk

**DEFENDANTS' RESPONSE AND OPPOSITION TO PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER
<u>AND PRELIMINARY INJUNCTION</u>**

BUTZEL LONG, a professional corporation
Steven M. Ribiat (P45161)
Philip J. Kessler (P15921)
Stoneridge West
41000 Woodward Avenue
Bloomfield Hills, Michigan  48304
(248) 258-1616
ribiat@butzel.com
kessler@butzel.com

TABLE OF CONTENTS

Page

STATEMENT OF ISSUE PRESENTED ..................................................................... ii

INDEX OF AUTHORITIES ...................................................................................... iii

I.      Preliminary Statement ................................................................................... 1

II.     Factual Background ....................................................................................... 4

        A.      Status of the bankruptcy proceedings in the Southern District of New York ......... 4

        B.      Delphi's settlement with the PBGC. ...................................................... 6

        C.      Plaintiffs' Bankruptcy Court objection to the PBGC settlement agreement. ......... 7

        D.      The settlement with the PBGC is vital to Debtors' reorganization. ...................... 7

III.    Argument ....................................................................................................... 9

        A.      Plaintiffs have not shown a strong likelihood of success on the merits ............... 10

                1.      The Defendants are not proper parties in interest herein. ......................... 11

                2.      Defendants are not conflicted and have breached no duty to Plaintiffs.... 13

                3.      Plaintiffs' remaining breach of fiduciary duty allegations fare no better.  16

                4.      There is no basis to replace Defendants with an "independent" fiduciary. ......................................................... 18

                5.      Plaintiffs' Lawsuit and Motion contravene the automatic stay. ............... 19

        B.      Plaintiffs have not established irreparable harm absent an injunction. ................. 20

        C.      The balance of relative harm and consideration of the public interest does not favor injunctive relief. ........................................................ 22

        D.      Plaintiffs ignore the bond requirements of Rule 65. ............................................. 23

IV.     Conclusion ..................................................................................................... 24

**STATEMENT OF ISSUE PRESENTED**

Whether Plaintiffs' application for a temporary restraining order preventing Defendants from effectuating a settlement agreement with the PBGC contemplating the summary termination of Delphi Corporation's Retirement Program for Salaried Employees should be denied in circumstances where:

(i)     Defendants are not the proper parties to this action because they are not the Plan Administrator of the pension benefits plan at issue and are not parties to the settlement with the PBGC;

(ii)    the only potential real party in interest is Delphi, a Debtor that cannot be sued because of the automatic stay afforded by the Bankruptcy Code;

(iii)   Plaintiffs do not have a likelihood of success on the merits because, among other reasons, ERISA does not afford them the rights they purportedly seek to vindicate;

(iv)    Plaintiffs are not at risk of suffering irreparable harm; and

(v)     granting the requested relief could potentially cause grievous harm to Delphi and its tens of thousands of constituents.

# INDEX OF AUTHORITIES

Page(s)

**Cases**

Bell Atlantic Corp. v. Twombly,
  550 U.S. 554, 127 S. Ct. 1955 (2007) .................................................................. 15

Charter Twp. of Van Buren v. Adamkus,
  965 F. Supp. 959 (E.D. Mich. 1997) .................................................................... 20

Curtiss-Wright v. Schoonejongen,
  514 U.S. 73 (1995) ............................................................................................... 18

Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18,
  471 F.2d 872 (6th Cir. 1972) ................................................................................. 9

Donovan v. Bierwith,
  680 F.2d 263 (2d Cir. 1982) ................................................................................. 14

Eberspaecher North America, Inc. v. Van-Rob, Inc.,
  544 F. Supp. 2d 592 (E.D. Mich. 2008) ............................................................... 22

Friend v. Sanwa Bank California,
  35 F.3d 466 (9th Cir. 1994) ................................................................................. 14

Hughes Aircraft Co. v. Jacobson,
  525 U.S. 432 (1999) ............................................................................................. 18

In re Adelphia Commc'ns Corp.,
  361 B.R. 337 (S.D.N.Y. 2007) ............................................................................. 24

In re Eagle-Picher Indus., Inc.,
  963 F.2d 855 (6th Cir. 1992) ............................................................................... 19

In re Singer Co., N.V.,
  2000 WL 33716976, at *2 (Bankr. S.D.N.Y. Nov. 3, 2000) ................................ 19

Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.,
  966 F. Supp. 540 (E.D. Mich. 1997) ........................................................... 9, 10, 15

Jones & Laughlin Hourly Pension Plan v. LTV CORP.,
  824 F.2d 197 (2d Cir. 1987), aff'd, 49 U.S. 633, 110 S. Ct. 2668 (1990) ................... 16, 17, 21

iii

*Larson v. Northrop Corp.*,
    21 F.3d 1164 (D.C. Cir. 1994) ..................................................................... 15, 16

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996) .................................................................................... 18

*Lucero v. Detroit Pub. Sch.*,
    160 F. Supp. 2d 767 (E.D. Mich. 2001) ..................................................... 20, 22

*Michigan Rehab. Clinic Inc., P.C. v. City of Detroit*,
    310 F. Supp. 2d 867 (E.D. Mich. 2004) ........................................................ 9, 15

*Ohio v. Celebrezze*,
    812 F.2d 288 (6th Cir. 1987) ....................................................................... 10

*PBGC v. Pension Comm. Of Pan American World Airways, Inc.*,
    777 F. Supp. 1179 (S.D.N.Y. 1991), *aff'd,* 970 F.2d 896 (2d Cir. 1992) ................................ 17

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000) ................................................................... 22

*Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*,
    119 F.3d 393 (6th Cir. 1997) ....................................................................... 10

*Waller v. Blue Cross*,
    32 F.3d 1337 (9th Cir. 1994) ..................................................................... 15, 16

*Washington v. Reno*,
    35 F.3d 1093 (6th Cir. 1994) ....................................................................... 10

*Wells Fargo & Co. v. WehU.com, Inc.*,
    293 F. Supp. 2d 734 (E.D. Mich. 2003) ..................................................... 20, 22

## <u>Statutes</u>

11 U.S.C. § 362 ................................................................................................... 3

26 U.S.C. § 412 ................................................................................................... 6

26 U.S.C. § 430(a) ............................................................................................... 6

29 U.S.C. § 1002(16) ........................................................................................... 11

29 U.S.C. § 1002(21) ........................................................................................... 11

29 U.S.C. § 1082 ................................................................................................. 6

29 U.S.C. § 1083 ................................................................................................... 6

29 U.S.C. § 11102(2) ........................................................................................... 11

29 U.S.C. § 1301, et seq. ....................................................................................... 1

29 U.S.C. § 1303(f) .......................................................................................... 2, 21

29 U.S.C. § 1342 ............................................................................................ 12, 21

29 U.S.C. § 1342(c) ....................................................................................... 10, 12

29 U.S.C. § 1370 ............................................................................................. 2, 21

**Rules**

Fed. R. Civ. P. 65(c) ............................................................................................ 23

Fed. R. Civ. P. 9(b) ............................................................................................. 15

## I.  **Preliminary Statement**

Plaintiffs urge this Court to:  (i) enjoin the Defendants from entering into an agreement to terminate Delphi Corporation's Retirement Program for Salaried Employees ("Salaried Plan"); and (ii) appoint an independent fiduciary to consider the interests of participants in termination of the Salaried Plan.  Plaintiffs' request is both flawed and futile, and it should therefore be denied.  This lawsuit is flawed because it is an improper collateral attack on the pension plan termination insurance program established under Title IV of the Employee Retirement Income Security Act, as amended ("ERISA"), 29 U.S.C. § 1301, et seq.  It is futile because the Defendants in this action do not have the authority to enter into an agreement to terminate the Salaried Plan, nor would an independent fiduciary appointed by the Court have such authority, and because the PBGC plainly has grounds for an involuntary termination under Section 4042 of ERISA regardless of whether Delphi consents.

Under an agreement between non-party Delphi and the Pension Benefit Guaranty Corporation ("PBGC"), PBGC agreed to initiate the termination of Delphi's underfunded Salaried Plan in accordance with Title IV of ERISA.  There can be no legitimate dispute that the Salaried Plan must be terminated—it is underfunded by almost $3 billion, and close to $200 million in contributions due the Salaried Plan have not been paid.

When an underfunded plan terminates, participants can lose part of their accrued retirement benefit.  But those losses are spread among participants based on the detailed framework in Title IV of ERISA for allocating the plan's limited assets and PBGC's insurance funds among the plan's benefit obligations.  The resulting allocation of the limited pool of plan assets and insurance funds is the allocation that Congress required.

Here, Plaintiffs evidently hope that by blocking—or at least postponing—implementation of the Salaried Plan's termination, they will continue to receive the full amount of their pensions, even though the Plan's assets are not sufficient to cover all of the Plan's benefit obligations. This attempt, if allowed, would skew the allocation of the Plan's limited pool of assets in Plaintiffs' favor, contrary to the mandatory allocation scheme in Title IV of ERISA and to the disadvantage of other Salaried Plan participants.

Plaintiffs' filings in this Court and in Delphi's bankruptcy case are a patent attempt to avoid the carefully crafted congressional scheme in Title IV of ERISA that governs the termination of underfunded defined benefit pension plans, like the Salaried Plan, and the allocation of assets among participants in the underfunded plan. Title IV of ERISA provides the exclusive means for terminating an underfunded plan. The appropriate course to challenge a plan termination also is found in Title IV of ERISA. Specifically, applicable civil claims provisions in Title IV of ERISA (29 U.S.C. § 1303(f) or 1370) allow plan participants to sue for equitable relief in connection with plan termination. Plaintiffs do not use that course of action here because they have no arguments under Title IV of ERISA. Instead, plaintiffs seek to end-run the plan termination rules under Title IV of ERISA. The Court should not condone this attempt.

Even if the Court were to grant the requested relief, however, that relief would be futile. Delphi, not the Defendants, is the plan administrator of the Salaried Plan—an indisputable fact ignored by Plaintiffs. The authority to agree to terminate the Salaried Plan, is vested exclusively with Delphi—not the Defendants—pursuant to the terms of the Salaried Plan itself and as a matter of statutory law. Plaintiffs did not (and could not) name Delphi as a party to this action,

because doing so would violate the automatic stay provisions of 11 U.S.C. § 362 imposed by Delphi's bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.[1]  Thus, Plaintiffs' request for an injunction enjoining *Defendants* from "negotiating," "signing" or "effectuating" an agreement to terminate the Salaried Plan is nonsensical and misdirected.  The negotiation, execution and effectuation of an agreement with the PBGC concerning the termination of the Salaried Plan rest squarely and exclusively with Delphi.

Moreover, Plaintiffs fail to inform the Court that before they filed this lawsuit, Plaintiffs filed objections to the Salaried Plan termination in Delphi's bankruptcy proceeding.  Those objections also challenge Defendants' alleged lack of independence and they are substantively identical to Plaintiffs' claims in this lawsuit.  Plaintiffs' objections to the Salaried Plan termination remain pending in the Bankruptcy Court.  Plaintiffs should not be permitted to simultaneously litigate the same issues regarding the Salary Plan termination in two different forums.  Nor should Plaintiffs be permitted to circumvent the automatic stay, as they attempt to do by this lawsuit and Motion.  Because Plaintiffs' Motion seeks relief against the wrong party and in the wrong forum, Plaintiffs' motion should be denied.

Plaintiffs' Motion should also be denied because they have not satisfied any of the relevant factors necessary for injunctive relief.  Plaintiffs cannot establish a strong likelihood of success on the merits.  Plaintiffs' allegations of breach of fiduciary duty are based upon

---

[1]  Early in the morning today, Delphi filed an emergency motion with the Bankruptcy Court seeking to stay Plaintiffs' action before this Court based upon enforcement of the automatic bankruptcy stay or, alternatively, an extension of the automatic stay.  *See* Exhibit 1 to Ribiat Declaration (hereafter, "Ribiat Decl, Ex. _").  According to Delphi's motion, Plaintiffs' action before this Court is a wrongful attempt to exercise control over the Debtors' property and threatens confirmation of Delphi's reorganization plan.  Delphi's emergency stay motion is scheduled to be heard by the Bankruptcy Court at 10:00 a.m. on July 24, 2009.

speculation, not fact, and the action that Plaintiffs' challenge—termination of the Plan—is not a fiduciary function.  They have not cited a single case where a plan fiduciary was removed because the fiduciary also served as an officer or director of a plan sponsor.  In fact, the courts have routinely recognized that plan fiduciaries often wear two hats.

Plaintiffs also cannot show the existence of irreparable injury, they cannot show that the balance of the relative harm to the parties favors an injunction, and they cannot show that an injunction serves the public interest.  Indeed, as discussed below, Delphi's agreement with the PBGC is critical to Delphi's reorganization and long-awaited emergence from bankruptcy.  Any injunction that purports to interfere with Delphi's ability to comply with the preconditions to its reorganization plan would cause devastating, if not irreparable, harm to Delphi and all of its constituents.  The public interest decidedly favors allowing the Bankruptcy Court to resolve the issues raised by Plaintiffs in the context of the bankruptcy proceedings.  Finally, challenging the PBGC's actions in federal court serve no one's interests, because the criteria for termination are so clearly satisfied.  Accordingly, Plaintiffs' Motion should be denied.

## II.  Factual Background

### A.    Status of the bankruptcy proceedings in the Southern District of New York.

In October 2005, Delphi and 41 of its direct and indirect subsidiaries (collectively, the "Debtors"), filed chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Southern District of New York.  *See* Ribiat Decl., Ex. 1, ¶ 2.  The Debtors' chapter 11 cases are large and complex, involving tens of thousands of parties in interest.  At the time of its bankruptcy filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of

assets.  Due to the distress in the U.S. automotive industry and the credit crisis in the capital markets, the Debtors have encountered unprecedented difficulties in their attempts to successfully reorganize.  Now, after almost four years of complex bankruptcy proceedings in New York, the Debtors are poised to emerge from chapter 11 protection through a series of significant transactions.

Specifically, on June 1, 2009, the Debtors reached an agreement to affect their emergence from chapter 11 through transactions with Parnassus Holdings II, LLC ("Parnassus"), an affiliate of Platinum Equity, and with the support of GM Components Holdings LLC ("GM Components"), an affiliate of GM.  *Id.*, ¶ 6.  The Debtors executed an agreement (the "Master Disposition Agreement") to reflect the foregoing transactions through a plan of reorganization (the "Modified Plan").  *Id.*, ¶¶ 3, 6 and 7.  The agreement and the changes to the Debtors' previously confirmed plan of reorganization were filed in the Bankruptcy Court on June 1, 2009.

On June 16, 2009, the Bankruptcy Court entered the Modification Procedures Order which, among other things, authorized the Debtors to commence solicitation of votes on the Modified Plan.  Under the Modified Plan, Delphi has agreed to contemporaneously effectuate transactions through which Parnassus will operate Delphi's U.S. and non-U.S. businesses going forward, with emergence capital and capital commitments of approximately $3.6 billion and without the labor-related legacy costs associated with Delphi's North American sites that, together with Delphi's global steering business, are being acquired by GM Components Holding LLC.  A new company, DPH Holdings Co., will emerge as a reorganized entity that retains certain other residual non-core and non-strategic assets and liabilities that are expected to be divested over time.  *See* Ribiat Decl., Ex. 1, ¶ 7.

The Bankruptcy Court has scheduled a July 29, 2009 hearing concerning, among other issues, approval of the Modified Plan.  *See* Ribiat Decl., Ex. 4.

**B.      Delphi's settlement with the PBGC.**

Several of the Debtors' pension plans, including the Salaried Plan, are severely underfunded.   Under the operative plan document, Delphi is the plan administrator for the Salaried Plan.  *See* Ribiat Decl., Ex. 5, Section 15, p. 144.  In connection with the Salaried Plan, the PBGC asserted that the Debtors and certain non-U.S. affiliates of the Debtors are liable for contributions due to the plan under the Internal Revenue Code ("IRC") and ERISA, 26 U.S.C. §§ 412, 430(a); 29 U.S.C. §§ 1082, 1083 ("Minimum Funding Obligations"), and filed Notices Of Federal Lien Under 26 U.S.C. § 412(n) and/or § 430(k) (the "Lien Notices") with respect to liens that the PBGC asserts against certain non-U.S. affiliates of the Debtors on account of unpaid Minimum Funding Obligations in connection with the Salaried Plan, among other plans. *See* Ribiat Decl., Ex. 1, ¶ 12 and Ex. 7.

On July 21, 2009, Delphi reached agreement with the PBGC to settle the PBGC's various claims against the Debtors and issued a press release communicating the general terms of the settlement, including the expected termination of Delphi's plans, including the Salaried Plan. *See* Ribiat Decl., Ex. 6.  Pursuant to the settlement agreement, the PBGC will receive a $3 billion allowed general unsecured non-priority claim and other consideration.   In return, among other benefits, the Debtors will receive a full release, including without limitation, the release and discharge of all causes of action, claims, and liens against the Debtors, and the PBGC's agreement to assume liabilities associated with the likely involuntary termination of the Salaried

Plan, and other benefits plans.  *See* Ribiat Decl., Ex. 7.  The agreement, which remains subject to Bankruptcy Court approval, has been filed with the Bankruptcy Court.

On July 22, 2009, the PBGC formally initiated termination of the Salaried Plan (as well as various other pension plans maintained by Debtors).  The plan terminations can be completed either by the execution of an agreement between PBGC and Delphi, as plan administrator, terminating the Salaried Plan, or through an action by PBGC in United States District Court against Delphi, as plan administrator.

**C.      Plaintiffs' Bankruptcy Court objection to the PBGC settlement agreement.**

On July 15, 2009, Plaintiffs filed an objection with the Bankruptcy Court challenging the Debtors' expected settlement with the PBGC on precisely the same grounds alleged in their Complaint and Motion before this Court.  *See* Ribiat Decl., Ex. 8.  Plaintiffs' objection is scheduled to be heard by the Bankruptcy Court at the upcoming July 29, 2009 hearing.

**D.      The settlement with the PBGC is vital to Debtors' reorganization.**

The Debtors and thousands of other parties in interest are at risk of suffering immediate and irreparable harm if a TRO is issued by this Court that could potentially interfere with the Debtors' settlement with the PBGC.

First, the PBGC settlement agreement is attached as an exhibit to the Modified Plan and must be approved by the Bankruptcy Court.  *See* Ribiat Decl., Ex. 3, Article 7.17(c) ("Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, this Plan constitutes the Debtors' request to authorize and approve the settlement with the PBGC . . . attached hereto substantially in the form of Exhibit 7.17.").  Article 12.2(d) of the Modified Plan provides that all

conditions precedent to the PBGC settlement agreement must be waived or satisfied to consummate the Plan.  *Id.*

Second, the settlement agreement with the PBGC is essential to the Debtors' ability to close the transactions set forth in the Master Disposition Agreement, which is a condition precedent for the Modified Plan to go effective.[2]  Under the Master Disposition Agreement, which is the foundation of Delphi's reorganization plan, the obligation of Parnassus to consummate the transactions is subject to the removal of all PBGC Encumbrances on Delphi's non-U.S. assets (*i.e.*, the PBGC's liens asserted on account of unpaid Minimum Funding Obligations).  *See* Ribiat Decl., Ex. 2.  Section 10.4.4 of the Master Disposition Agreement provides that "[t]he Pension Benefit Guaranty Corporation shall have agreed to remove any Encumbrances of the Pension Benefit Guaranty Corporation on the Company Acquired Assets and the assets of the Sale Companies and the assets of the entities that issued the Company Sales Securities."[3]  This condition to close under the Master Disposition Agreement may be waived by Parnassus but cannot be waived by the Debtors.  *Id.*  The settlement agreement with the PBGC globally resolves the Debtors' pension issues and is the only way that the PBGC will release the

---

[2]  Article 12.2(b) of the Modified Plan (Ribiat Decl., Ex. 3) provides that for the Modified Plan to go effective, "all conditions precedent to the consummation of the Master Disposition Agreement shall have been waived or satisfied in accordance with the terms thereof."

[3]  Under the Master Disposition Agreement (Ribiat Decl., Ex. 2), "'**Encumbrance**' means: (i) with respect to the Sale Securities, any voting trust, shareholder agreement, proxy, preemptive right, right of first refusal, or other similar restriction; and (ii) **with respect to the Acquired Assets** (including the Sale Securities or any other shares of capital stock owned by Sellers, Buyers or their respective Affiliates) **or any other property or asset, any lien**, charge, claim, pledge, security interest, conditional sale agreement or any other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or a similar law relating to security interests in and over Personal Property)." (Emphasis added).

liens that the PBGC asserts against certain non-U.S. affiliates of the Debtors, thereby facilitating the transactions with Parnassus.[4]

Finally, entry into the settlement agreement with the PBGC is itself an independent condition for the Modified Plan to become effective. (*See* Article 12.2(d) of the Modified Plan.) Thus, without approval of the PBGC settlement agreement, the Modified Plan may not be confirmable.

## III. Argument

Injunctive relief is an extraordinary remedy that should only be used sparingly. *Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.,* 966 F. Supp. 540, 541 (E.D. Mich. 1997). Indeed, "a preliminary injunction is the strong arm of equity which should not be extended to cases which are doubtful or do not come within well established principles of law." *Michigan Rehab. Clinic Inc., P.C. v. City of Detroit*, 310 F. Supp. 2d 867, 870 (E.D. Mich. 2004), citing *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18*, 471 F.2d 872, 876 (6th Cir. 1972).

This Court must evaluate and balance four factors when considering whether to issue this exceptional relief:

> (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability

---

[4]   Article 12.1.2 of the Master Disposition Agreement provides that the agreement may be terminated at any time prior to closing "By any Party if the Closing has not occurred by September 30, 2009, provided such date shall be extended until November 30, 2009 in the event that all conditions to Closing are satisfied or capable of being satisfied on the Closing Date, other than the condition set forth in Section 10.1.2 (relating to government approvals of the transaction) and provided further that the terminating party will not have the right to terminate this Agreement if it is in material default hereunder."

that granting the injunction will cause substantial harm to others; and (4) whether
the public interest is advanced by the issuance of the injunction.

*Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994) (citation omitted).  "A district court is

required to make specific findings concerning each of the four factors, unless fewer factors are

dispositive of the issue."  *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399

(6th Cir. 1997) (citation omitted).  Plaintiffs cannot meet their burden of demonstrating that each

of the four factors favors an injunction.

**A.       Plaintiffs have not shown a strong likelihood of success on the merits.**

The Court should not consider granting injunctive relief unless Plaintiffs have

demonstrated a "strong or substantial likelihood or probability of success" on their claims.

*Jerome Duncan, Inc.,* 966 F. Supp. at 541.  Demonstrating some merit or a mere possibility of

success is not sufficient.  *Ohio v. Celebrezze,* 812 F.2d 288, 290 (6th Cir. 1987).

Plaintiffs' entire Complaint, and their Motion, are based upon their contentions that the

Defendants, Delphi executives and named fiduciaries under the Salaried Plan, are in the process

of negotiating an agreement with the PBGC summarily to terminate the Plan.   While the

Plaintiffs acknowledge that the summary termination of a pension plan is expressly sanctioned

by 29 U.S.C. § 1342(c), they contend that the Defendants, because of their dual status as

fiduciaries and Delphi executives, are laden with an "irreconcilable conflict of interest" which

necessitates their immediate removal as fiduciaries.   (Pl. Brief, DE 3-2, p. 13.)   In addition,

Plaintiffs contend that Defendants' participation in the effectuation of the summary termination

of the Salaried Plan is a breach of their fiduciary duties owed to Plaintiffs.   As demonstrated

below, Plaintiffs' contentions are totally misguided, and wholly without merit.

1.      __The Defendants are not proper parties in interest herein__.

As a threshold matter, Plaintiffs are operating under a total misconception about the role of the Defendants with respect to the Salaried Plan, and, thus, the effectuation of any summary termination of the Salaried Plan.  Irrefutably, and based upon undeniable evidence in the form of the Salaried Plan itself, it is Delphi, and not the Defendants, who is authorized to effectuate an agreement with the PBGC that results in the summary termination of the Salaried Plan.[5]

In his supporting Declaration (DE 3-4, at ¶ 6), Plaintiff Cunningham attests that his review of the Salaried Plan indicates that each of the Defendants are "named fiduciaries" under the Salaried Plan.  This much is correct.  *See*, Ribiat Decl., Ex. 5, Section 14, p. 143.  What Plaintiff Cunningham fails to mention, however, is that the next page of the Salaried Plan document confirms that Delphi is the "Plan Administrator."  *Id.*, Section 15 (a), p. 144.

Under ERISA, "plan administrator" and "named fiduciary" are two separate concepts. The "administrator" is defined under 29 U.S.C. § 1002(16), as "the person specifically so designated by the terms of the instrument under which the plan is operated" or, if none is named, the "plan sponsor," which is defined as the "employer" for a single employer plan.  The "named fiduciary" is defined under 29 U.S.C. § 11102(2) as "a fiduciary who is named in the plan instrument," and under 29 U.S.C. § 1002(21) "fiduciary" is defined as someone who exercises discretionary authority with regard to management and disposition of plan assets.

---

[5]  Although Delphi has reached agreement with the PBGC and has acquiesced in the PBGC's likely involuntary termination of the Salaried Plan, the PBGC will involuntarily terminate the Plan whether the Master Disposition Agreement goes forward or not.  Termination in connection with the Debtors' reorganization plan will, however, result in maximized value for all stakeholders, including the Salaried Plan participants.

Notwithstanding the clear denomination of the separate and distinct titles and roles of Delphi and Defendants regarding the administration of the Salaried Plan, throughout their Complaint and Motion Plaintiffs interchangeably, but erroneously, refer to the Defendants as "fiduciaries" and as the "Plan Administrator."   This distinction between Delphi, as Plan Administrator, and the Defendants, as named fiduciaries, is not one that is without a difference, however.  Indeed, the fact that Delphi is the Salaried Plan Administrator is fatal to the Plaintiffs' claim.

As Plaintiffs acknowledge, (Pl. Brief, DE 3-2, pp. 6-7), ERISA subsection 1342(c) (29 U.S.C. § 1342) specifically allows for the summary termination of a plan, but only upon the agreement of the PBGC and the "Plan Administrator."  Thus, under the statute and the Salaried Plan, the Defendants simply have no legal ability or capacity to effectuate an agreement with the PBGC summarily to terminate the Salaried Plan.

Based upon their erroneous contention that the *Defendants* are the Plan Administrator, Plaintiffs have improperly sued the Defendants, baselessly contending that *they* are in the process of entering into an agreement with the PBGC summarily to terminate the Salaried Plan, in purported breach of their fiduciary duties.  As demonstrated above, this is impossible, because only Delphi, as the Plan Administrator, has the legal and statutory capacity to enter into an agreement to effectuate the summary termination of the Salaried Plan.  *See* 29 U.S.C. § 1342(c). Accordingly, it is in fact Delphi who is the party signatory to the settlement agreement with the PBGC which contemplates the likely summary termination of the Plan.  *See* Ribiat Decl., Ex. 7. It is no coincidence that Plaintiffs make this mistake of law.  Plaintiffs are merely trying to use

12

their Complaint as an end-around the automatic stay and the plan termination rules under Title IV of ERISA.

Under no circumstances, then, can Plaintiffs obtain the relief they seek as to these Defendants; *i.e.,* "a temporary restraining order and preliminary injunction prohibiting the <u>Plan Administrator</u> from negotiating, signing, or effectuating an agreement with the PBGC summarily to terminate the Plan . . . ."  (Pl. Brief, DE 3-2, p. 20, emphasis added.)  Plaintiffs must seek that relief against Delphi, the Plan Administrator.  Delphi, of course, is not a party to this action, nor could it be given the automatic stay imposed by its bankruptcy filing.  Defendants have no legal ability to enter into an agreement with the PBGC to summarily terminate the Salaried Plan. Accordingly, granting the requested injunction against the Defendants would be utterly futile.

> ### 2. <u>Defendants are not conflicted and have breached no duty to Plaintiffs.</u>

As shown above, Plaintiffs' claims are improperly premised upon their patently erroneous notion that Defendants are the "Plan Administrator."  Further perpetuating this misconception, Plaintiffs acknowledge that "there is nothing inherently wrong with assigning to Delphi executives the additional role of *Plan Administrators*" (Brief, DE 3-2, p. 11, emphasis added), and that "a fiduciary wear[ing] 'two hats' as an employer and an *administrator* . . . assumes fiduciary status *only* when and to the extent that he functions in his capacity as *plan administrator.*"  *Id.* (emphasis added).

First, it is indisputable that the Plan Administrator is Delphi, and not the Defendants. Therefore, under Plaintiffs' own analysis the Defendants are not fiduciaries in connection with Delphi's effectuation of the likely termination of the Salaried Plan, and cannot possibly breach any duties in connection therewith.

13

Second, even if Defendants were capable of effectuating an agreement with the PBGC summarily to terminate the Salaried Plan, the only purported breach of duty alleged by Plaintiffs is Defendants' failure to remove themselves as fiduciaries in the face of what Plaintiffs conclude, without citation to any legal authority, is a conflict of interest arising from Defendants' supposed conflicting loyalties to Delphi, as executives, and to the Plan participants, as fiduciaries.

Plaintiffs' contentions in this regard are contrary to well established law, acknowledged by the Plaintiffs themselves (Pl. Brief, DE 3-2, p. 11), that there is no inherent conflict of interest in company executives acting as fiduciaries of a plan, or even as a Plan Administrator.  *See*, *Friend v. Sanwa Bank California*, 35 F.3d 466, 467 (9th Cir. 1994):

> Further, nowhere in the statute does ERISA explicitly prohibit a trustee from holding positions of dual loyalties.  A bank does not commit a per se violation of section 1104(a)(1) by the mere act of becoming a trustee with conflicting interests.  Congress never intended section 1104(a)(1) to establish a per se rule of fiduciary conduct . . . and no court has established such a violation.  Therefore, we hold that a trustee does not necessarily violate section 1104(a)(1) by accepting a trusteeship with dual loyalties. (Citation omitted)

*See also Donovan v. Bierwith*, 680 F.2d 263 (2d Cir. 1982).

Thus, Plaintiffs' mere conclusory allegations of supposed conflicting loyalties, standing alone and without legal authority, do not establish an improper conflict of interest of the Defendants, let alone a breach of fiduciary duty as Plaintiffs contend.  Similarly, Plaintiffs' suggestion that Plaintiffs' interests are necessarily being impaired in some unspecified way by Defendants, and that the Defendants will necessarily act against the Plaintiffs' interests out of some superior loyalty to Delphi, is also rank speculation and utterly groundless.

On their face, Plaintiffs' Complaint and Motion are bereft of a single specific factual allegation as to how their interests would be unlawfully impaired by the PBGC's summary

14

termination of the Salaried Plan, or what more could have in fact been achieved under the circumstances. Based upon sheer speculation, Plaintiffs' contentions that Defendants actually breached some duty, or will necessarily breach some duty, are insufficient to state a claim against the Defendants. *See*, Fed. R. Civ. P. 9(b); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 127 S. Ct. 1955, 1964-95 (2007) ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions…. Factual allegations must be enough to raise a right to relief above the speculative level.").

Plaintiffs' speculative contentions also fall far short of satisfying their burden of demonstrating a "strong or substantial likelihood or probability of success" on their claims. *Jerome-Duncan, Inc.*, 966 F. Supp. at 541; *Michigan Rehab. Clinic*, 310 F. Supp. 2d at 870. Indeed, it appears that the relief Plaintiffs seek is not to protect the interests of the Salaried Plan participants, but rather, to assure that they continue to receive the full amount of their benefits for as long as possible, regardless of whether that result is in the interests of other Salaried Plan participants or consistent with Title IV of ERISA.

Finally, Plaintiffs acknowledge the well established law that "an employer's decision to terminate a pension plan is what is known as a sponsor's 'settlor' function, as opposed to a fiduciary function." (Plaintiffs' Brief, DE 3-2, p. 11.) However, citing *Larson v. Northrop Corp.*, 21 F.3d 1164 (D.C. Cir. 1994), and *Waller v. Blue Cross*, 32 F.3d 1337 (9th Cir. 1994), Plaintiffs argue that while the employer's decision to terminate a pension plan is not subject to any fiduciary responsibility provision of ERISA, the activities undertaken to implement the termination are fiduciary in nature.

15

The problem with Plaintiffs' argument is that it is *Delphi*, as Plan Administrator, that is effectuating the termination of the Salaried Plan through its agreement with the PBGC. Similarly, in each of *Larson* and *Waller* it was the *employer* who had effectuated the termination of the plan at issue. Thus, any claim by Plaintiffs that some fiduciary duty was breached or will be breached as the result of Delphi's agreement with the PBGC that will likely result in the summary termination of the Salaried Plan must be asserted against Delphi, and not against the Defendants. Plaintiffs simply cannot maintain any claim against the Defendants as the result of Delphi's effectuation of the PBGC's termination of the Plan.

### 3. <u>Plaintiffs' remaining breach of fiduciary duty allegations fare no better</u>.

Other than their speculative conflict of interest contentions, Plaintiffs offer only two specific examples of how Defendants supposedly breached their fiduciary duties. (Pl. Brief, DE 3-2, pp. 15-16.) First, Plaintiffs suggest that Defendants breached a duty to inform them about the status of termination discussions between Delphi and the PBGC. (Pl. Brief, DE 3-2, p. 15.) Plaintiffs are wrong as a matter of law.

In *Jones & Laughlin Hourly Pension Plan v. LTV CORP.*, 824 F.2d 197, 199 (2d Cir. 1987), *aff'd*, 49 U.S. 633, 110 S. Ct. 2668 (1990), the court specifically addressed this very question; namely, "whether ERISA requires that plan members and other interested parties receive notice and an opportunity to be heard before [the] PBGC and the plan administrator may terminate a plan in a summary termination proceeding under subsection 1342(c) [29 U.S.C. § 1342, ERISA § 4042(c)]." In that case, the PBGC determined that LTV's plans failed to meet the statutory minimum funding requirements and notified LTV, the plan administrator, of PBGC's intention to terminate them. PBGC obtained LTV's agreement to a consent order

16

appointing PBGC as statutory trustee of the plans and terminated them without prior notice to plan members. *Id.*

The Court held that ERISA "permits PBGC and the administrator to proceed as they did here, *i.e.*, to proceed in summary fashion without affording plan members pre-termination notice and hearings to contest the propriety of the termination decision." *Id.* The Court further observed that "the only mention of notice in subsection 1342(c) speaks to notice *to the plan administrator*." *Id.* at 200 (emphasis supplied). The Court opined that it "cannot ignore Congress' obvious omission; there simply is no provision for notice to plan participants. . . . Having concluded that no pre-termination court adjudication is required when PBGC and the plan administrator agree to terminate, we reject the Union's claimed statutory right to pre-termination notice." *Id.*

Defendants' alleged failure to inform Plaintiffs about Delphi's termination discussions with the PGBC cannot be a breach of fiduciary duty, because ERISA imposes no duty to inform plan participants or other interested parties about such discussions pre-termination. *Id.* As Plaintiffs note, an involuntary termination decision is made either by the PBGC and agreed to by the plan administrator, or by a U.S. District Court upon request by the PBGC. But participants are not entitled to notice of these proceedings. Participants' interests are protected through the establishment of the date of plan termination, which generally must be a date that is no earlier than the date that participants had actual or constructive notice that they would no longer accrue benefits under the plan. *See, e.g., PBGC v. Pension Comm. Of Pan American World Airways, Inc.*, 777 F. Supp. 1179 (S.D.N.Y. 1991), *aff'd,* 970 F.2d 896 (2d Cir. 1992). Because the

Salaried Plan was frozen in September 2008, participants have had notice for almost a year that they will not earn additional benefits under the Salaried Plan.

Second, Plaintiffs contend that Defendants breached a fiduciary duty to Plaintiffs by "abandoning" the Salaried Plan to the PBGC, but protecting Delphi's Hourly Workers Plan by securing a deal with GM in September 2008 that GM would assume up to $3.4 billion in net pension liabilities from Delphi's Hourly Plan. (Brief, DE 3-2, pp. 5, 15-16.) Even if Plaintiffs' "favoritism" allegation were true—and it is not—it is legally irrelevant. There is no fiduciary duty to provide similar benefits to participants in different plans. And the Supreme Court has repeatedly held that the decision whether and how to design pension plans or to terminate or amend the plans is not a fiduciary decision at all. *E.g., Curtiss-Wright v. Schoonejongen*, 514 U.S. 73, 78 (1995); *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999). Moreover, GM—having since pursued its own bankruptcy reorganization—has stated that it will not assume the Hourly Plan and will not complete the second transfer, as initially agreed in September 2008. (*See* Ribiat Decl., Ex. 9, Delphi 7/21/09 press release.) Accordingly, Plaintiffs' breach of fiduciary duty allegations is factually incorrect and wrong as a matter of law.

### 4.        There is no basis to replace Defendants with an "independent" fiduciary.

Plaintiffs' Motion contends that, based upon their arguments that Defendants are burdened by a conflict of interest and have supposedly breached their fiduciary duties to Salaried Plan participants, Plaintiffs are "likely to prevail ultimately in obtaining the limited form of relief they are seeking in their Complaint for equitable relief: The appointment of an independent

18

fiduciary as *Plan Administrator*. . . ."   (Brief, DE 3-2, p. 9, emphasis added.)   Plaintiffs' contention could not be further from the truth.

To be stressed, Plaintiffs' Motion effectively seeks to displace and replace the *Plan Administrator*, which is indisputably Delphi.  Obviously, this cannot be accomplished by this action, since Delphi has not been named as a party defendant and to do so would violate the automatic stay.  In any event, to the extent that the Defendants can be deemed capable to effectuate an agreement with the PBGC to summarily terminate the Salaried Plan, Plaintiffs have failed to cite a single decision supporting their contention that removal of the Defendants as named fiduciaries is warranted.

Moreover, and as also set forth above, the removal and replacement of the Defendants as fiduciaries would be futile, and the requested injunctive relief would in no way maintain the status quo, since it is Delphi, and not the Defendants, with authority to agree to terminate the Salaried Plan.

5.     **Plaintiffs' Lawsuit and Motion contravene the automatic stay.**

The automatic stay codified in section 362 of the Bankruptcy Code would extend to these proceedings, because a TRO (even though on its face only against the Defendants, and not Delphi) would so directly affect the Debtors and property of their estates that the order sought would effectively be a judgment against the Debtors.  *See, e.g., In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 860-61 (6th Cir. 1992) (extending automatic stay to nondebtor directors who had indemnification agreements with the debtor entities after finding such identity between the third party and the debtor as though the debtor was the real party in interest); *In re Singer Co., N.V.*, 2000 WL 33716976, at *2 (Bankr. S.D.N.Y. Nov. 3, 2000) (extending automatic stay to

injunction proceedings against the debtors' distributors for distributing allegedly patent-infringing goods manufactured by the debtors after finding that the action against the third party was inextricably intertwined with the debtors).

Similarly on point, in a bench ruling entered by the Bankruptcy Court on May 22, 2007 in the Delphi bankruptcy proceedings, Judge Drain stayed an action against an employee of the Debtors brought in Mississippi state court on the ground that there was an identity of interest between the individual defendant and the Debtors. *See* Ribiat Decl., Ex. 10.

If this Court issued a TRO and allowed litigation to proceed, it would be deciding questions that *Plaintiffs* have already presented to the Bankruptcy Court for determination. But more importantly, this Court would be resolving issues that directly affect the Debtors and their property and are properly resolved by the Bankruptcy Court.

**B.    Plaintiffs have not established irreparable harm absent an injunction.**

A request for injunctive relief must be denied unless the plaintiff can demonstrate a likelihood of irreparable harm. *Charter Twp. of Van Buren v. Adamkus,* 965 F. Supp. 959, 970 (E.D. Mich. 1997). "A finding of irreparable harm is the single most important prerequisite that the Court must examine when ruling upon a motion for a preliminary injunction." *Wells Fargo & Co. v. WehU.com, Inc*., 293 F. Supp. 2d 734, 771 (E.D. Mich. 2003) (citation omitted). *See also, Lucero v. Detroit Pub. Sch.*, 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001) ("A showing of 'probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction'").

Here, the "irreparable" injury claimed by Plaintiffs is the loss of alleged procedural protections provided to participants in a summary termination proceeding under ERISA

subsection 1342 (29 U.S.C. § 1342, ERISA § 4042(c)).  (Brief, DE 3-2, p. 17.)  But the premise of Plaintiffs' contention is false.  In fact, ERISA expressly permits a beneficiary adversely impacted by the PBGC's actions to challenge an involuntary termination.  Participants may bring an action for equitable relief under 29 U.S.C. § 1303(f) or § 1370 in connection with plan termination.  Plaintiffs do not use that course of action because they have no arguments under Title IV of ERISA.  Instead, Plaintiffs seek to end-run ERISA's plan termination rules.

Moreover, Plaintiffs cite no applicable authority to support their contention that a loss of these alleged procedural protections satisfies the irreparable harm requirement necessary for injunctive relief.  Indeed, the cases Plaintiffs cite involved the loss of *constitutional* rights and freedoms, not the loss of alleged procedural rights under a comprehensive statutory scheme that expressly contemplates the summary termination of a plan without pre-termination notice to plan participants or an opportunity for such participants to be heard.  *Jones & Laughlin Hourly Pension Plan v. LTV CORP.*, 824 F.2d at 202 ("We conclude that notice and a court adjudication prior to the termination of the plans are not required and that the present administrative procedures comport with due process.").

Moreover, given that Plaintiffs filed objections in the Bankruptcy Court to the Debtors' Plan regarding, among other things, the settlement agreement with the PBGC concerning the termination of the Salaried Plan, Plaintiffs cannot legitimately contend that they will be irreparably harmed if this Court denies their Motion.  Although Plaintiffs will properly be denied two bites at the apple, their challenge to the termination of the Salaried Plan will be heard by the Bankruptcy Court on July 29, 2009, which is the forum in which these issues should be resolved.

Again, a "showing of 'probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. . . .'" *Lucero*, 160 F. Supp. 2d at 801; *Wells Fargo & Co.*, 293 F. Supp. 2d at 771.  Plaintiffs' inability to make such a showing compels the denial of this Motion.  *Eberspaecher North America, Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592, 603 (E.D. Mich. 2008) ("[t]he absence of a substantial likelihood of irreparable injury . . . standing alone[] make[s] preliminary injunctive relief improper.") (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).

**C.**     **The balance of relative harm and consideration of the public interest does not favor injunctive relief.**

As shown above, this Court's denial of the injunctive relief sought by the Plaintiffs would not cause the Plaintiffs any legally cognizable harm.  Conversely, if this Court enters a TRO prohibiting Delphi from effectuating the settlement agreement with the PBGC, which contemplates the PBGC initiating termination proceedings against the Salaried Plan, Delphi's ability to obtain confirmation of and substantially consummate the Modified Plan will be in grave danger.

The issuance of such relief would interfere with the effectuation of the summary termination of the Plan, even temporarily, and further delay the confirmation of the Modified Plan, which would cause substantial harm to the Debtors and likely to all parties in interest in the bankruptcy proceedings.  Also as a consequence, the global resolution of the Debtors' pension issues would be frustrated, the Debtors would not obtain the release of the PBGC's asserted liens against certain non-U.S. affiliates of the Debtors and the Master Disposition Agreement—the foundation of Delphi's reorganization plan—would be in jeopardy.

Plaintiffs, on the other hand, suffer no harm by the Court's refusal to issue the requested relief, since the Defendants are not conflicted as Plaintiffs contend, and since the Plaintiffs' claims are totally speculative and fail to allege any specific, viable breaches by Defendants of any fiduciary duties.  By their own admission, Plaintiffs seek the requested injunctive relief so that they can have an opportunity to have the contemplated summary termination evaluated by an "unconflicted" fiduciary, a right that the law does not confer upon Plaintiffs, and concede that it is quite possible that the circumstances do in fact warrant the summary termination intended by Delphi and the PBGC.  (Plaintiffs' Brief, DE 3-2, p. 18.)

Thus, Plaintiffs seek this relief based upon no more than their own speculation and conjecture that the Defendants will necessarily act against Plaintiffs' interests, and in favor of the interests of Delphi.  Based upon what is no more than a blind assumption that the contemplated summary termination improperly infringes their interests, the Plaintiffs would have this Court potentially derail the confirmation of the Modified Plan in Delphi's bankruptcy case.  Under these circumstances, the relative harm weighs heavily in favor of the denial of Plaintiffs' Motion.

**D.   Plaintiffs ignore the bond requirements of Rule 65.**

The federal rules mandate that a preliminary injunction may be issued only if "the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully" enjoined.   Fed. R. Civ. P. 65(c). Plaintiffs fail to address this mandatory requirement in their Motion.  Given the substantial harm to Delphi and its constituents if an injunction were issued that interferes with the preconditions to its reorganization plan, Plaintiffs must be ordered to post a bond.  Accordingly, if this Court grants Plaintiffs' Motion—and it should not for all of the reasons discussed in this Brief—

Plaintiffs should be required to post a bond in an amount that reflects the substantial harm and injury likely to be caused to Debtors' multi-billion dollar reorganization. *See e.g., In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 368 (S.D.N.Y. 2007) (court orders $1.3 billion bond based on assessment of potential harm caused by stay).

### IV. <u>Conclusion</u>

For the reasons discussed above, Defendants respectfully request that this Court enter an order denying Plaintiffs' Motion, dismissing Plaintiffs' complaint with prejudice, and granting such other relief as the Court deems just and proper.

Respectfully submitted,

BUTZEL LONG, a professional corporation

Dated:  July 23, 2009

<u>s/ Steven M. Ribiat</u>
Philip J. Kessler (P15921)
Steven M. Ribiat (P45161)
Stoneridge West
41000 Woodward Avenue
Bloomfield Hills, Michigan  48304
Telephone number:  (248) 593-7801
Email address:  ribiat@butzel.com
Attorney Bar No. P45161
Attorneys for Defendants

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 23, 2009, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  Howard S. Sher.

s/ Steven M. Ribiat
Butzel Long, a professional corporation
Stoneridge West
41000 Woodward Avenue
Bloomfield Hills, Michigan  48304
Telephone number:  (248) 593-7801
Email address:  ribiat@butzel.com
Attorney Bar No. P45161